# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JASON JONES,
  Petitioner,

vs.

MICHAEL SHEETS,
  Respondent.

Civil Action No. 1:09-cv-158

Barrett, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

Petitioner, a state prisoner, brings this case *pro se* seeking a writ of habeas corpus pursuant

to 28 U.S.C. § 2254. This matter is before the Court on the petition and memorandum in support

thereof (Docs. 2, 3) and respondent's return of writ and exhibits thereto. (Doc. 6).

## I. PROCEDURAL HISTORY

This case involves the following facts, as summarized by the First District Ohio Court of

Appeals:[1]

> {¶ 1} Defendant-appellant Jason Jones was indicted for two counts of murder and
> one count of involuntary manslaughter, each carrying accompanying firearm
> specifications. All charges related to the death of Junis Sublett. Jones sought to
> suppress identification testimony. After a hearing, his motion to suppress was
> denied by the trial court. The case proceeded to a jury trial, where Jones was
> acquitted of murder and all firearm specifications but found guilty of involuntary
> manslaughter. Jones received a sentence of eight years' imprisonment.
>
> *<br>*<br>*
>
> {¶ 4} Junis Sublett was shot in the head and run over by a speeding automobile as he
> and Randy Washington attempted to rob two drug dealers, Jason Jones and James
> Marshall, on May 18, 2005.

---

[1] The factual findings of the state appellate court are entitled to a presumption of correctness in the absence
of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see McAdoo v. Elo*, 365 F.3d 487, 493-94
(6th Cir. 2004).

### The State's Witnesses

{¶ 5} Randy Washington testified during trial that he, Sublett, and DeAngelo Tait had hatched a plan to rob a drug dealer. Washington had listened to a telephone call between Tait and James Marshall, during which Tait had set up a drug sale between Marshall and Washington and Sublett. According to Washington, the sale was for two pounds of marijuana. Washington and Sublett planned to rob Marshall when he arrived for the sale. Washington testified that Sublett was going to conduct the actual robbery and that he had planned to drive the getaway car. The drug sale was to take place in the Pleasant Run Apartments.

{¶ 6} Washington stated that Marshall and Jason Jones arrived at the apartment complex in a green Dodge Durango. Jones, whom Washington had never seen prior to this event and whose name he did not know at the time, was driving the car. Marshall called Sublett's cellular telephone when they arrived, and Washington and Sublett approached the Durango. Washington stood on the driver's side of the vehicle, next to Jones. Sublett stood on the passenger side of the vehicle and eventually climbed into the Durango's back seat. Once Jones and Marshall showed him the marijuana, Washington began to walk away from the Durango. Washington testified that he had waited in a nearby breezeway until he received a signal from Sublett indicating that he should get their getaway car. As he was running to the car, Washington heard gunshots. He panicked, entered his car, and began to drive away. Washington testified that he saw Sublett lying on the ground, bleeding. Washington approached Sublett and called the police. According to Washington, he saw two plastic bags full of marijuana on the ground near Sublett. Washington removed the marijuana from the scene and hid it in a nearby apartment.

{¶ 7} Washington testified that, during an interview with the Springfield Township Police following Sublett's murder, he was able to tell the police where Marshall lived. He further identified Marshall in an individual photograph and Jones in a photographic lineup. Washington admitted that he had been charged with murder for his role in helping to plan the robbery that resulted in Sublett's death. Washington stated that he had not been promised anything in return for his testimony, but that he was hoping to receive some leniency in exchange for it.

{¶ 8} DeAngelo Tait testified that he had set up a drug sale between Marshall and Washington and Sublett after Washington had told him that Sublett needed some "pot." According to Tait, the sale was for two and a half pounds of marijuana, of which he was to receive half a pound. Tait believed that he had only set up a drug sale, and he did not know that Washington and Sublett intended to rob Marshall. Tait further admitted that he had prior convictions for aggravated robbery and receiving stolen property, and that he had pled guilty to manslaughter relating to Sublett's death, although he had not yet been sentenced for that offense.

{¶ 9} The state additionally presented the testimony of Latonia Lawson and Virginia Banks. Both Lawson and Banks testified that they were at the Pleasant Run Apartments on May 18, 2005, and that they had heard gunshots and seen a man fall to the ground. Both saw a green sports utility vehicle speed away and drive over the man. Lawson testified that she had called 911 and ran over to the man. She saw more than one bag lying around him, but could not recall what was inside the bags. Banks testified that the green car had some kind of stickers or graffiti on its windows.

{¶ 10} Harry Patel, general manager for a Days Inn motel in Indianapolis, testified that at approximately 10:22 p.m. on May 18, 2005, a man named Fred Jones checked into his motel. This man listed his vehicle as a 1998 Dodge Durango, and although he had checked in with the name Fred Jones, the cardholder's name on the receipt signed by the man was Jason Jones. The state presented additional testimony from Jamie Starkey, an employee of the Ohio Bureau of Motor Vehicles. Starkey identified a state identification card registered to Jason Jones and containing a photograph of Jones. Starkey further identified a license registered to a Frederick White Jones, but containing a photograph of Jason Jones.

{¶ 11} Frederick Mattress, a regional security manager for PNC Bank, testified that, on May 26, 2005, a search warrant was executed on a safety deposit box registered to Jones and Sheila Marshall at PNC Bank's Pleasant Ridge branch. The box was empty when searched, but records indicated that Jones had signed to obtain access to the box on May 20, 2005. Bennie Phiefer, a fraud-investigations manager for PNC Bank, testified that he was present for the execution of a search warrant on a safety deposit box at PNC Bank's Hyde Park branch on May 26, 2005. The box was owned by Jones and contained $50,000.

{¶ 12} Springfield Township Police Officer Nicholas Peterson testified that he had responded to a dispatch regarding a shooting at the Pleasant Run Apartments. Peterson was told by the dispatcher that a sports utility vehicle had been seen leaving the scene. Upon his arrival, Peterson saw a body and a scattered pile of marijuana on the ground. Peterson additionally noticed a broken cellular phone, tire marks, and two pools of blood. Peterson testified that the body was lying in the path of the tire marks.

{¶ 13} Springfield Township Lieutenant David Schaefer testified that, on May 19, 2005, he had shown Washington a photographic lineup, and that Washington had identified Jones as the driver of the green Durango. Springfield Township Detective Pat Kemper testified that he had returned to the Pleasant Run Apartments on May 23, 2005, to search for bullet casings and projectiles, as these items had not been recovered. Kemper found a spent casing at the scene, although he could not

definitively state that the casing was related to Sublett's murder.

{¶ 14} Springfield Township Police Officer Phil Crowley testified that he had obtained from a hospital a weapon that had been found in Sublett's clothing. It was a fully loaded .32-caliber Smith and Wesson revolver. Springfield Township Police Detective James Ohl testified that he had test-fired this weapon and that it was operational. Ohl further testified about his investigation into Sublett's murder. According to Ohl, Washington had provided the police with Marshall's address, and although he did not know Marshall's name, Washington had referred to him as a "white Mexican." From the address, the police obtained Marshall's name, and Washington identified Marshall from a photograph. The police ran Marshall's name in a LexisNexis police database. This database returned the name of Sheila Marshall, Marshall's sister. And by entering Sheila Marshall's name into the database, Ohl received Jason Jones' name, as Jones and Sheila Marshall owned property together and were in a relationship. Ohl discovered that Sheila Marshall owned a green Dodge Durango.

{¶ 15} Ohl further testified that, on May 20, 2005, he had received word that Sheila Marshall had been stopped on Interstate 75 while driving the Durango. Ohl responded to this scene. He testified that, because Sublett had been run over, the Durango was tested for forensic evidence such as transfer of blood, skin, and clothing, but that the results had come back inconclusive.

{¶ 16} Ohl received permission from Sheila Marshall to search her residence. Sheila Marshall lived in Butler County, and therefore the search was conducted by police from that jurisdiction, although Ohl was present for it. Police found 429 pounds of marijuana in the home, inside two different freezers. During the search, police also found a box of Winchester nine-millimeter fully jacketed bullets. Ohl testified that he had compared the spent casing found in the Pleasant Run Apartments to the casings on the bullets in Sheila Marshall's residence. The spent casing was similar to some of the bullets found in the home. Specifically, they were made by the same manufacturer and contained the same markings on the head of the casings. Numerous documents addressed to and pertaining to Jones were found in the residence, including a delivery order for a chest freezer.

{¶ 17} According to Ohl, he spent much time trying to find both James Marshall and Jones. Ohl eventually was able to trace Marshall to North Carolina. Ohl contacted officers in Lincolnton, North Carolina. He sent to the Lincolnton officers photographs of both Marshall and Jones, and asked them to investigate an address that he had provided. Marshall was apprehended in North Carolina by Lincolnton police officers. The state presented the testimony of two officers from Lincolnton, North Carolina, concerning the apprehension of Marshall. The Lincolnton officers did not find Jones with Marshall, but one officer had encountered Jones at the designated address in North Carolina during an unrelated investigation.

{¶ 18} The state presented testimony from Chief Deputy Coroner Gary Utz. Utz testified that Sublett had died from perforation of his skull and brain caused by a gunshot wound to his head. The bullet had entered Sublett's skull behind his left ear and exited on the right side of his temple. According to Utz, Sublett had not experienced a contact or close-range wound, as there was no stippling present. Utz further testified that extensive bruising was found on Sublett's torso and upper extremities. The bruising was consistent with tire marks. Utz stated that these injuries were minor compared to the brain injury that Sublett had experienced, but that they could have caused his death.

## B. Jones' Witnesses

{¶ 19} James Marshall testified on behalf of Jones at trial. According to Marshall, on May 18, 2005, DeAngelo Tait had asked him to take Tait's cousin, D.C., to the Pleasant Run Apartments to sell marijuana to someone named Brandon. Marshall testified that D.C. had picked him up in a green Chevrolet Tahoe. When they arrived at the apartments, Marshall noticed two suspicious-looking men. He called Brandon, but one of the men answered the phone and asked him, "Is that you in the green truck?" The two men, whom Marshall later came to know as Washington and Sublett, walked over to D.C.'s car. Marshall warned D.C. that the men intended to rob them, but D.C. did not heed his warning. According to Marshall, Randy Washington indicated that he had previously seen Marshall at a club, but Marshall denied ever seeing Washington prior to this incident. The two men stated that Brandon was in his apartment, and that they were just verifying that Marshall and D.C. were not the police.

{¶ 20} Sublett got into the back seat of D.C.'s car. He looked at the marijuana and demanded to purchase it for a lower price. Marshall testified that D.C. agreed to lower the price, but asked to see some money. Sublett then pulled out a gun, pointed it at Marshall, and told Marshall to put his head between his legs. Sublett took the marijuana, exited from the car, and stood at the passenger window next to Marshall. Sublett attempted to open Marshall's door, and Marshall, who still had his head down, heard gunshots above his shoulder and head coming from the direction of D.C. Marshall sat up and saw D.C. with a gun in his hand. D.C. sped away, and Marshall testified that he felt the car drive over something. D.C. drove into Kentucky; at some point, Marshall jumped out of the car and ran away.

{¶ 21} According to Marshall, he called a friend, Ryan Alexander, to pick him up in Kentucky. He spent the night at Alexander's house, and the next day Alexander drove him to Louisville, Kentucky, to meet Jones. Alexander was involved in a car accident, and while Jones took Alexander home, Marshall stayed in a hotel in Kentucky. Jones called Marshall at the hotel, stating that Jones' face was on the news as a suspect in a murder. He and Jones then traveled to North Carolina to stay with Marshall's aunt. Marshall admitted that he had been charged with murder for

the death of Junis Sublett, and that he had prior convictions for breaking and entering, receiving stolen property, theft, and several drug-related offenses.

{¶ 22} Ryan Alexander testified that he had picked up Marshall in Kentucky on either the 18th or the 19th of May 2005, and that Marshall had been hysterical. He then took Marshall to Louisville, Kentucky, where they met Jones.

{¶ 23} Finally, Jones presented the testimony of Larry Dehus. Dehus testified that he had experience in forensic science and that he owned a consulting and testing laboratory business, Law-Science Technologies, that evaluated criminal evidence and conducted accident reconstruction. According to Dehus, if a vehicle had run over a human body, a thorough inspection of that vehicle would have revealed some type of trace evidence such as hair, fiber, or blood, for up to five or six weeks after the date of the incident. But Dehus conceded that he had never examined the vehicle alleged to have run over Sublett in this case.

(Doc. 6, Exh. 12 at 2-9).

Petitioner, through counsel, timely appealed his conviction and sentence to the First District

Ohio Court of Appeals. (Doc. 6, Exhs. 9-10). The Ohio Court of Appeals overruled petitioner's

seven assignments of error. (Doc. 10, Exh. 8). Petitioner's appeal to the Supreme Court of Ohio

was dismissed as not involving any substantial constitutional question. (Doc. 6, Exhs. 13-16).[2]

## II. FEDERAL HABEAS CORPUS

Petitioner filed the instant petition for a writ of habeas corpus setting forth the following

grounds for relief:

> **GROUND ONE:** The trial court erred to the prejudice of Appellant by finding him guilty of involuntary manslaughter, as those findings were not supported by sufficient evidence, and the state failed to meet its burden of proof.

> **GROUND TWO:** The trial court erred to the prejudice of the Appellant by finding him guilty of involuntary manslaughter, as those findings were contrary to law, and were against the manifest weight of evidence.

---

[2]Petitioner also filed a pro se petition for a new trial based on "newly discovered evidence"–identified as his trial transcripts. (Doc. 6, Exh. 17). His petition was denied by the trial court and petitioner failed to perfect a timely appeal to the Ohio Court of Appeals. (Doc. 6, Exh. 18). A subsequent motion for delayed appeal was dismissed by the state appellate court for his failure to comply with the appellate rules. (Doc. 6, Exhs. 19-20).

**GROUND THREE:** The trial court erred to the prejudice of the Appellant by overruling his Motion for acquittal under Ohio Criminal Procedure Rule 29, as the stae [sic] failed to meet its burden of proving that Appellant was guilty of involuntary manslaughter.

**GROUND FOUR:** The trial court erred when it allowed the state to present evidence of Appellant's arrest on drug charges and discovery of drugs and weapons, as that violated Evid R. 404(B).

**GROUND FIVE:** The trial court erred when it denied Appellant's motion for a mistrial, as the state committed prosecutorial misconduct in its closing statement.

**GROUND SIX:** The trial court erred to the prejudice of Appellant by not granting his motion to suppress the identification evidence when such evidence resulted from unduly suggestive techniques by the police.

**GROUND SEVEN:** The trial court erred to the prejudice of Appellant by imposing a sentence that is contrary to law because it was excessive.

(Doc. 2).

## III. STANDARD OF REVIEW

On federal habeas review, the factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This Court is bound by the state court adjudications unless those decisions are contrary to or an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104- 132, 110 Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A legal principle is "clearly established" for purposes of habeas corpus review "only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010).

> The phrases "contrary to" and "unreasonable application" have independent meanings: A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in . . . [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable . . . and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).

If a state court does not articulate the reasoning behind its decision or fails to adjudicate the constitutional issues, the AEDPA deferential standard of review set forth in section 2254(d) is inapplicable. *See Wiggins v. Smith,* 539 U.S. 510, 534 (2003); *Towns v. Smith*, 395 F.3d 251, 257 (6th Cir. 2005); *see also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where . . . the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.")). Under these circumstances, the constitutional claim is reviewed *de novo* and the Court considers "the totality of the evidence-'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins,* 539 U.S. at 536 (emphasis in the original) (quoting *Williams v. Taylor,* 529 U.S. 362, 397-98 (2000)). *Accord Clinkscale*, 375 F.3d at 436.

8

## IV. PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM ASSERTED IN GROUNDS ONE AND THREE OF THE PETITION IS WITHOUT MERIT.

Grounds One and Three of the petition assert that petitioner's involuntary manslaughter conviction is not supported by sufficient evidence in violation of the Due Process Clause. Petitioner argues that the only witness identifying petitioner at the scene of the shooting was Randy Washington, a "self-serving co-defendant" who hoped to receive a lighter sentence for his testimony and whose credibility was suspect given his motive to lie. (Doc. 3, memo. at 4). Petitioner contends that DeAngelo Tait had a similar motive for testifying against petitioner and that his testimony should be weighed with caution and suspicion. *Id.* Finally, petitioner asserts there was no physical evidence tying him to the crime, including the absence of evidence found in the vehicle he was allegedly driving at the time of the shooting. *Id.* at 5.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case from conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). In analyzing claims of insufficient evidence, the Court must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). This standard reserves to the trier of fact the responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Id.* at 318-319.

On habeas corpus review, the federal court conducts an independent review of the state court record in analyzing petitioner's sufficiency of the evidence claim. *Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006). However, the Court "does not reweigh the evidence or redetermine the

credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "*Jackson* makes clear that 'a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 326). In addition, circumstantial evidence may be sufficient to support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *See Jackson*, 443 U.S. at 326; *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995); *Jamison v. Collins*, 100 F. Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Matthews*, 319 F.3d at 788.

The First District Court of Appeals overruled petitioner's insufficiency of evidence claim as follows:

{¶ 24} In his first, second, and third assignments of error, Jones argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence, and that the trial court erred in overruling his Crim.R. 29 motion for an acquittal. We address these assignments together.

{¶ 25} When reviewing the record for the sufficiency of the evidence, this court must view all the evidence presented in the light most favorable to the prosecution and determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt.[1] The same standard is employed to determine whether a trial court properly overruled a Crim. R. 29 motion for an acquittal.[2] But when reviewing the manifest weight of the evidence, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed."[3]

Fn. 1. See *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

Fn. 2. See *State v. Jordan,* 167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, ¶ 49.

Fn 3. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 26} Jones was found guilty of involuntary manslaughter. Involuntary manslaughter is defined in R.C. 2903.04(A) as "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." In this case, the state alleged that Jones had caused the death of Sublett while committing or attempting to commit the offense of trafficking in drugs. The jury was instructed that, to find that Jones had committed or attempted to commit drug trafficking, it had to find that Jones had knowingly sold or offered to sell marijuana.

{¶ 27} Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could reasonably have found that Jones had caused the death of Sublett while trafficking in drugs, specifically while offering to sell marijuana. Regarding the trafficking in drugs, both Randy Washington and DeAngelo Tait testified that Tait had arranged for a sale of marijuana from Marshall to Washington and Sublett. The jury was presented with evidence that Jones had arrived with Marshall to conduct the sale. Washington further testified that he had seen the marijuana before the sale or robbery occurred, and that he had removed two bags of marijuana from Sublett's body. Officer Peterson saw a scattered pile of marijuana on the ground near Sublett. Moreover, 429 pounds of marijuana were found in a home shared by Jones and Sheila Marshall, and $50,000 was found in a safety deposit box registered to Jones.

{¶ 28} The jury was further presented with sufficient evidence that Jones had caused Sublett's death. It heard testimony that Washington had identified Jones as the driver of the car that had run over Sublett, and that Jones' girlfriend owned a green Dodge Durango, a vehicle that matched the description of this same car. Also linking Jones to the crime was Detective Ohl's testimony that the spent casing found at the scene was made by the same manufacturer and contained similar markings to the casing on bullets found in Jones' home. The evidence further established that, several hours after Sublett's murder, a Fred Jones had checked into a motel in Indianapolis, registered his vehicle as a 1998 Dodge Durango, and paid with a credit card belonging to Jason Jones. The jury heard testimony from an employee of the Ohio Bureau of Motor Vehicles that Jones had received a driver's license containing his own photograph but issued in the name of Frederick White Jones. And Jones had visited a safety deposit box, which was empty when searched, two days after Sublett's murder, and he had then resided in North Carolina for approximately one month. Moreover, Chief Deputy Coroner Utz testified that Sublett had died from receiving a gunshot wound to his head, but that the injuries he had received after

being run over by a motor vehicle could have caused his death as well.

{¶ 29} Following our review of the record, we conclude that Jones' conviction for involuntary manslaughter was supported by sufficient evidence and that the trial court did not err in overruling his Crim. R. 29 motion for an acquittal. And we further conclude that Jones' conviction was not against the manifest weight of the evidence. The jury was aware of the prior convictions of several of the witnesses. And as the jury was able to personally view the demeanor of the witnesses, it was in the best position to judge their credibility. The jury was entitled to reject James Marshall's testimony that someone named D.C., rather than Jones, had been in the car during the drug sale and had shot Sublett. On this record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice.

(Doc. 6, Exh. 11 at 17-18).

Upon review of the entire record, this Court agrees with the finding of the state court of appeals that the evidence supports a finding of guilt beyond a reasonable doubt. This case rested in large part on the credibility of witnesses and co-defendants Randy Washington and John Marshall. Mr. Washington testified that he, Sublett and Tait hatched a plan to rob drug dealers on May 18, 2005. (Tr. 473-77). Tait testified that he spoke with Marshall, a supplier, to arrange a sale of two and a half pounds of marijuana for Washington and Sublett. (Tr. 710-12). In contrast, Marshall testified that Tait arranged a sale for his cousin, D.C. (Tr. 920).

Washington testified that on the date in question, the drug dealers were in a green Durango, with Marshall in the passenger seat and petitioner in the driver's seat. (Tr. 480, 502). However, Marshall testified that he was the passenger in a green Tahoe driven by D.C. (Tr. 920-21). Marshall testified that after Sublett threatened both he and D.C. with a gun, D.C. pulled out a gun, shot Sublett, and drove away. (Tr. 928-30).

Washington testified that after Sublett was shot, he observed two bags of marijuana lying next to Sublett's body. (Tr. 492-93). Hours after the shooting, petitioner was in Indianapolis with the Durango at a motel registered under the name Fred Jones, but paid for with a credit card in his

12

own name. (Tr. 416-17). Springfield Township Police Officer James Ohl testified that petitioner and Sheila Marshall owned a property together and that Sheila Marshal owned a vehicle of the make suspected as the vehicle involved in Sublett's death. (Tr. 768-69). Officers later discovered that Sheila Marshal was petitioner's girlfriend and James Marshall's sister. (Tr. 770). A search of the residence at which Sheila Marshal and petitioner resided revealed the presence of 429 pounds of marijuana (Tr. 781-89) and ammunition matching the bullet casings found at the scene of Sublett's shooting. (Tr. 790-95). Petitioner had also emptied a safe deposit box of $50,000.00 shortly after the shooting. (Tr. 688-90, 695-96, 802-803). From this evidence, the jury could have reasonably determined that in the process of selling marijuana to Sublett, petitioner caused Sublett's death.

Both Marshall and Washington were subjected to vigorous cross-examination by opposing counsel who attempted to cast doubt on their credibility and their motivations for testifying. The jury could reasonably have believed the testimony of Washington, while discrediting Marshall's contrary version of events, and on habeas review, this Court may not reweigh the evidence and reassess the credibility of the witnesses. *O'Hara,* 499 F.3d at 500; *Matthews,* 319 F.3d at 788. In fact, the Court must presume that the jury resolved the conflicting evidence in favor of the prosecution in weighing the evidence in this case. *O'Hara,* 499 F.3d at 499, 500. When viewed in the light most favorable to the prosecution, the identification testimony of Washington, coupled with the testimony of Tait and the testifying police officers who investigated the incident, was sufficient to establish the essential elements of involuntary manslaughter beyond a reasonable doubt.

There was sufficient evidence from which any rational trier of fact could find petitioner guilty of involuntary manslaughter beyond a reasonable doubt. When viewing all of the evidence in

13

the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, and for the reasons discussed by the state appellate court, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's conviction for involuntary manslaughter.

Therefore, the sufficiency of evidence claim alleged in Grounds One and Three of the petition is without merit and should be denied.

## V. PETITIONER'S MANIFEST WEIGHT OF THE EVIDENCE CLAIM ALLEGED IN GROUND TWO IS NOT COGNIZABLE IN HABEAS CORPUS.

In Ground Two of the petition, petitioner asserts his conviction is against the manifest weight of the evidence. A "manifest weight of evidence" claim, which is based on a state law concept that is "both quantitatively and qualitatively different" from a constitutional due process sufficiency of evidence standard, *see Tibbs v. Florida,* 457 U.S. 31, 41-47 (1982), and *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546 (1997), *superseded by state constitutional amendment on other grounds in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), raises an issue of state law only that is not cognizable in a federal habeas corpus proceeding such as this. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without proof sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.), *cert. denied*, 464 U.S. 962 (1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.

14

307, 319 (1979).

However, under Ohio law, a claim that a verdict was against the manifest weight of the
evidence–as opposed to one based upon insufficient evidence–requires the appellate court to act as a
"thirteenth juror" and to review the entire record, weigh the evidence, and consider the credibility
of witnesses to determine whether "the jury clearly lost its way and created such a manifest
miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*,
20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720 (1st Dist. Ohio 1983); *cf. Tibbs v. Florida*, 457 U.S.
31 (1982). Since a federal habeas court does not function as an additional state appellate court,
vested with the authority to conduct such an exhaustive review, petitioner's claim that his
convictions were against the manifest weight of the evidence cannot be considered by this Court.

Therefore, petitioner's second claim should be dismissed as non-cognizable.

## VI. GROUND FOUR OF THE PETITION IS WITHOUT MERIT.

Ground Four of the petition asserts that the trial court erred when it permitted the state to
present evidence of petitioner's arrest on drug charges and the discovery of drugs and weapons in
violation of Ohio Evid. Rule 404(B). Petitioner contends the trial court impermissibly allowed the
state to present evidence that 429 pounds of marijuana, along with guns and ammunition, had been
found at the home that petitioner shared with his girlfriend. He also contends that the admission of
evidence that he had been arrested by Butler County, Ohio authorities on marijuana charges violated
Ohio Evid R. 404(B) and Evid R. 403(A). Respondent contends this ground for relief is not
cognizable in federal habeas corpus because it involves an issue of state evidentiary law.

In addressing the merits of petitioner's claim, the First District Court of Appeals, the last
state court to issue a reasoned opinion on the claim, found the following:

15

{¶ 31} In his fourth assignment of error, Jones argues that the trial court erred by allowing the state to present, in violation of Evid. R. 404(B), evidence concerning Jones' arrest on drug charges and the discovery of drugs and weapons at Jones' home. Specifically, Jones takes issue with the introduction of evidence that 429 pounds of marijuana, as well as weapons and ammunition, had been found in a home owned by Jones and Sheila Marshall, and that he had drug-related charges pending against him in Butler County related to the marijuana found in his home.

{¶ 32} Evid. R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But such evidence is admissible for other purposes, including to establish identity, scheme, plan, and absence of mistake or accident.[4] Evidence of a scheme or plan is relevant to help the jury understand the background of a case.[5] As this court has previously noted, "[b]ackground information is admissible to give the jury the setting of the case. Generally, the jury is entitled to know the setting of a case because it cannot be expected to make its decision in a void, without knowledge of the circumstances of the acts which form the basis of the crimes charged."[6] The evidence at issue in this case helped the jury to understand the circumstances surrounding and the events leading up to Sublett's murder, in particular Jones' involvement with the sale of marijuana.

Fn. 4. See Evid. R. 404(B). See, also, R.C. 2945.59.

Fn. 5. See *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 315-316, 415 N.E.2d 261.

Fn. 6. *State v. Duncan* (1998), 130 Ohio App.3d 77, 86, 719 N.E.2d 608, internal citations omitted.

{¶ 33} This court has specifically held that other-acts evidence is admissible to show a defendant's involvement in a drug-dealing operation.[7] In this case, the evidence was admissible for exactly that purpose. To secure a conviction for involuntary manslaughter, the state was required to prove that Jones had caused the death of Sublett while trafficking in marijuana. And evidence concerning the marijuana found inside Jones' home, as well as the charges pending against Jones in Butler County, was relevant to proving that Jones had trafficked in marijuana. Given that the testimony from Randy Washington and DeAngelo Tait indicated that the drug sale had been set up with James Marshall, this evidence was extremely helpful in establishing Jones' identity as Marshall's companion and the driver of the automobile.

Fn. 7. See *State v. Dominguez* (Jan. 29, 1999), 1st Dist. No. C-980148.

{¶ 34} And the evidence concerning the weapons and ammunition found inside

Jones' home further helped to establish Jones' identity as the driver of the vehicle that had run over Sublett, as Detective Ohl had testified that the casings on several of the bullets found inside Jones' home were similar to the spent casing found at the murder scene.

{¶ 35} Consequently, we conclude that the trial court did not err in admitting this evidence. The fourth assignment of error is overruled.

(Doc. 6, Exh. 12 at 12-13).

Petitioner has failed to show that the state court of appeals' decision is contrary to, or an unreasonable application of, clearly established federal law. "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 543 U.S. 892 (2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991); *see also Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001), *cert. denied*, 535 U.S. 1031 (2002) (stating in reference to habeas corpus challenge to admission of other-acts evidence that "[s]tate court evidentiary rulings do not rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.") (internal quotation marks and citations omitted); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001) ("Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding.") (internal quotation marks and citation omitted).

With respect to the admission of prior bad acts evidence, the Sixth Circuit has found that there is no clearly established United States Supreme Court precedent holding that the admission of such evidence violates the Due Process Clause:

17

There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior injury evidence violated due process, thus warranting habeas relief. 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n. 5, 112 S.Ct. 475. Moreover, in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose is served. *Id.* at 563-64, 87 S.Ct. 648. The Court recognized that it was not "a rule-making organ for the promulgation of state rules of criminal procedure. And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564, 87 S.Ct. 648. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms. Accordingly, the district court correctly found that there is no Supreme Court precedent that the trial court's decision could be deemed "contrary to," under AEDPA.

*Bugh v. Mitchell*, 329 F.3d 496, 512-513 (6th Cir. 2003).

Thus, under *Bugh*, even if the prior acts evidence to which petitioner objects was improperly admitted by the trial court, there is no clearly established Supreme Court precedent which holds that the admission of such propensity evidence violates the Due Process Clause. "The Supreme Court has not made a contrary ruling since *Bugh* and the holding that there is no 'clearly established' due process right against the use of propensity evidence is binding in this Circuit until either the Supreme Court or Sixth Circuit says otherwise." *Rice v. Moore*, 633 F. Supp.2d 541, 556 (S.D. Ohio 2008) (quoting *Sifuentes v. Prelesnik*, No. 1:03-cv-637, 2006 WL 2347529, at *1 (W.D. Mich. Aug. 11, 2006)). *See also Doan v. Voorhies*, No. 1:00-cv-727, 2007 WL 894559, at *18 (S.D. Ohio March 21, 2007).

In addition, even if petitioner states a cognizable claim, he is not entitled to relief in this

case. The Ohio Court of Appeals upheld the trial court's determination that the disputed evidence was properly admitted to give the jury an understanding of the background of the drug dealing operation and petitioner's involvement therein. The state appellate court reasonably determined that the evidence was relevant to prove petitioner trafficked in marijuana, an underlying element of the involuntary manslaughter offense, and to prove his identity as Marshall's companion and the driver of the vehicle. The jury was entitled to understand the context in which the crime occurred, including the full background and setting of the case so as not to make its decision in a vacuum. The disputed evidence was properly admitted under Ohio law to show petitioner's scheme, plan or system in committing the crime, as well as his identity. Petitioner has not shown that the admission of the prior acts evidence rendered his trial fundamentally unfair. The Ohio Court of Appeals' decision is neither contrary to United States Supreme Court precedent nor an unreasonable application of federal law. Therefore, petitioner is not entitled to habeas relief due to the allegedly erroneous evidentiary ruling.

## VII. THE PROSECUTORIAL MISCONDUCT CLAIM ALLEGED IN GROUND FIVE OF THE PETITION IS WITHOUT MERIT.

Ground Five of the petition alleges the trial court erred when it denied petitioner's motion for a mistrial on the basis of the prosecutor's misconduct during closing argument. Petitioner asserts the prosecutor improperly called petitioner's witness, James Marshall, a liar and a person of moral turpitude. Petitioner also takes issue with prosecutor's reference to Marshall's possession of two bags of marijuana when the substance of the bags was never tested to prove its content. Petitioner further contends the prosecutor improperly referred to the 426 pounds of marijuana found at petitioner's residence, suggesting that the two pounds of marijuana being sold were taken from

19

the house, and that petitioner was a drug dealer.

In addressing this claim of error, the Ohio Court of Appeals found as follows:

{¶ 36} In his fifth assignment of error, Jones argues that the trial court erred in denying his motion for a mistrial based on prosecutorial misconduct in closing argument.

{¶ 37} Jones takes issue with the prosecutor's labeling of James Marshall as a liar and a person of moral turpitude. He further argues impropriety in the prosecutor's comments that Marshall had two bags of marijuana, that 429 pounds of marijuana had been found inside Jones' home, and that Jones was a drug dealer.

{¶ 38} To support a claim of prosecutorial misconduct, a defendant must prove that the prosecutor's remarks were improper and that they had a prejudicial effect on substantial rights of the defendant.[8] The prosecutor's statements must not be evaluated in isolation, but rather in light of the entire closing argument.[9] "[T]he prosecution is normally entitled to a certain degree of latitude in its closing remarks."[10]

> Fn. 8. *State v. Smith* (1998), 130 Ohio App.3d 360, 366, 720 N.E.2d 149.

> Fn. 9. See *State v. Kelly,* 1st Dist. No. C-010639, 2002-Ohio-6246, at ¶ 22, citing *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.

> Fn. 10. *State v. Smith* (1984), 14 Ohio St.3d 13, 470 N.E.2d 883.

{¶ 39} We first address the prosecutor's labeling of Marshall as a liar and a person of moral turpitude. Defense counsel objected to the comment concerning moral turpitude, and the trial court sustained the objection. "Error cannot be predicated on objections which have been sustained by the trial court."[11] And it was not improper for the prosecutor to refer to Marshall as a liar. This court has held that "it is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonabl[y] supports that characterization."[12] When commenting that Marshall had lied, the prosecutor cited specific testimony by Marshall and how it conflicted with both physical evidence and testimony from other witnesses. The evidence reasonably supported the prosecutor's statement.

> Fn. 11 *State v. Austin* (Dec. 17, 1986), 1st Dist. No. C-860148.

> Fn. 12. *State v. Murrell,* 1st Dist. No. C-020333, 2003-Ohio-2068, ¶ 25.

{¶ 40} Similarly, the prosecutor's remarks that Marshall had possessed two bags of marijuana, that 429 pounds of marijuana had been found inside Jones' home, and that Jones was a drug dealer were all fair commentary on the evidence presented at trial. In the preceding assignment of error, we determined that it was not error to allow the introduction of evidence concerning the marijuana found inside Jones' home. Accordingly, the prosecutor was entitled to comment on that evidence during closing argument. The jury heard further testimony that Jones and Marshall had two bags of marijuana inside their car and that, following Sublett's murder, Washington had removed two bags of marijuana from the scene. This testimony supported the prosecutor's comments during closing argument.

{¶ 41} Jones further argues that, because the marijuana had never been tested to verify that it was actually marijuana, it was improper for the prosecutor to tell the jury that it was in fact marijuana. But Jones' attorney had cross-examined the police on this issue and had made reference to it during closing argument. The jury was aware that the marijuana had not been tested. The testimony and the argument concerning the marijuana were proper; it was within the province of the jury to determine what weight to assign the evidence.

{¶ 42} These remarks during closing argument were not improper and did not rise to the level of prosecutorial misconduct. We conclude that the trial court properly denied Jones' motion for a mistrial, and the fifth assignment of error is overruled.

(Doc. 6, Exh. 12 at 13-15).

The scope of federal habeas corpus review of petitioner's prosecutorial misconduct claims is narrow because the federal court does not sit as an appellate court with supervisory power to rectify general trial errors. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). Although a court confronted with a such a claim must first determine whether the challenged conduct was improper, a finding of impropriety is not sufficient in itself to amount to a due process violation. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 179-80 (1986). Rather, "[t]he touchstone of due process analysis in such a case is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that

the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "Even if the prosecutor's conduct was 'undesirable or even universally condemned,' this Court can only provide relief if the [conduct was] so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). The reviewing court's focus in a claim of prosecutorial misconduct is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982). A prosecutor's alleged misconduct must be examined within the context of the entire trial to determine whether it deprived a defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11-12 (1985). "Reversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.'" *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997)).

The Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id*. at 452. Upon a finding of impropriety, the court then determines if the statements were flagrant. *Id*. The Court considers four factors in determining flagrancy: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003); *Macias*, 291 F.3d at 452. *See also Darden,* 477 U.S. at 182; *Young,* 470 U.S. at 12; *Donnelly*, 416 U.S. at 646-647. Other relevant factors include

22

whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182; *Berger v. United States,* 295 U.S. 78, 84-85 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212 (1960), or whether a curative instruction was given by the trial judge, *see Darden,* 477 U.S. at 182.

In the instant case, petitioner asserts the prosecutor during closing argument called his defense witness, James Marshall, a liar and a person of moral turpitude. The prosecutor asserted that Marshall "lied . . . straight out" and proceeded to review, in detail, how Marshall's testimony "doesn't fit the facts." (Tr. 1021-1022). The prosecutor reviewed Marshall's prior convictions, his relationship to petitioner, his motive for lying, and the improbability of Marshall's description of the shooting in contrast to the physical evidence of how the shooting occurred. (Tr. 1022-25).

There is a distinction between calling a defense witness a liar where "significant evidence offered at trial supported the prosecutor's statements" and where "statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial." *Cristini v. McKee,* 526 F.3d 888, 902 (6th Cir. 2008) (quoting *Hodge v. Hurley,* 426 F.3d 368, 378 (6th Cir. 2005)). Under the first scenario, the prosecutor argues from the evidence that certain testimony should not be believed. *Cristini,* 526 F.3d at 902. Under the second scenario, the prosecutor's argument conveys "an impression to the jury that they should simply trust the State's judgment that . . . the defendant's witnesses were non-credible, if not perjurious." *Id.* (quoting *Hodge,* 426 F.3d at 378-79).

Here, the prosecutor's statement was supported by the evidence in the record that Mr. Marshall should not be believed because he had been convicted of crimes of dishonesty which legitimately impacted his credibility and because his story of the shooting did not fit the physical

23

evidence in the case. The jury was not asked to simply trust the prosecutor that Mr. Marshall was not believable. The "liar" comment was isolated and in context was not improper. *Cristini,* 526 F.3d at 902.

In addition, petitioner's objection to the "moral turpitude" comment was sustained by the trial judge. (Tr. 1022). The trial judge also instructed the jury to disregard statements to which the court sustained the objections thereto. (Tr. 1075-76). Juries are presumed to follow an instruction absent an "overwhelming probability" the jury will be unable to follow the instruction. *Greer v. Miller,* 483 U.S. 756, 767 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant."). *See also Hill v. Mitchell,* 400 F.3d 308, 325 (6th Cir. 2005); *Washington v. Hofbauer,* 228 F.3d 689, 706 (6th Cir. 2000). There is no indication from the record that the jury was incapable of following this instruction or that the statement was "devastating" to petitioner's defense.

Finally, the Ohio Court of Appeals reasonably determined that the prosecutor's remarks regarding Marshall's possession of two bags of marijuana, the large amount of marijuana found in petitioner's home, and that petitioner was a drug dealer were fair commentary based on the evidence presented at trial. Washington testified that he, Sublett and Tait planned to rob drug dealers on May 18, 2005. (Tr. 473-77). DeAngelo Tait testified that the drug deal was for two and one-half pounds of marijuana and that he spoke with Marshall to arrange the sale. (Tr. 710-12). Washington's testimony places both Marshall and petitioner in the vehicle used to facilitate the sale. (Tr. 480, 502). Washington testified the deal was for two pounds of marijuana and that he removed two bags

of marijuana from Sublett's body after Sublett was shot. (Tr. 476, 492-94). Officer Ohl testified that 429 pounds of marijuana was found at petitioner's residence. (Tr. 783). The trial testimony, taken together, amply supported the prosecutor's remarks and the jury could draw the reasonable inference that petitioner was a drug dealer from the direct and circumstantial evidence presented.

Even assuming the comments of the prosecutor during closing argument were improper, *Macias*, 291 F.3d at 452, they were not so flagrant as to render the entire trial fundamentally unfair. The prosecutor's comments occurred during closing argument and petitioner does not contend that the prosecutor acted inappropriately at any other point during the trial. Because the comments were isolated, this factor does not weigh in petitioner's favor. *Bowling*, 344 F.3d at 512. Nor has petitioner presented any evidence suggesting that the prosecutor intentionally made any improper statements. The absence of any evidence of intent in the record weighs against a finding of flagrancy. *Id.*

The Ohio Court of Appeals' determination that the prosecutor's comments in closing argument did not violate petitioner's due process rights was not objectively unreasonable. Petitioner has failed to demonstrate the prosecutor's challenged statements in closing argument deprived him of a fair trial. Accordingly, petitioner is not entitled to habeas corpus relief based on the prosecutorial misconduct claim alleged in Ground Five of the petition.

## VIII. GROUND SIX OF THE PETITION IS WITHOUT MERIT.

Ground Six of the petition asserts the trial court erred in overruling petitioner's motion to suppress eyewitness identification, contending it resulted from unduly suggestive techniques that were not reliable. Petitioner argues that Mr. Washington was shown photos of individuals prior to being shown a photo lineup which included petitioner's photo. The initial photos were apparently

25

destroyed and no witness could recall the specific photos. Petitioner contends it is reasonable to conclude that one of those destroyed photos must have included petitioner.

In addressing the merits of petitioner's claim, the First District Court of Appeals, the last state court to issue a reasoned opinion on the claim, found the following:

{¶ 44} A two-part test is used to determine whether identification testimony should be suppressed.[13] First, the defendant must demonstrate that the identification procedure was unnecessarily suggestive.[14] If the defendant meets this burden, the court must then determine whether the procedure was so suggestive that it gave rise to a substantial likelihood of misidentification.[15] Even if the identification procedure was suggestive, a resulting identification is admissible as long as it is proved to be reliable.[16]

Fn. 13. *State v. Haynes,* 1st Dist. No. C-020685, 2004-Ohio-762, ¶ 3.
Fn. 14. *Id.*
Fn. 15. *Id.*
Fn. 16. *Id.*

{¶ 45} During an interview with the Springfield Township police following Sublett's death, Randy Washington was shown photographs of various individuals. But these photographs were apparently lost or destroyed, and neither Washington nor any Springfield Township officers could recall who was depicted in the photographs. Jones argues that it is reasonable to conclude that one of these photographs was of Jones. He thus argues that Washington's later identification of him in a photographic lineup was unreliable.

{¶ 46} We are not persuaded by Jones' argument. During a hearing on Jones' motion to suppress, Detective Ohl testified that the interview with Washington had begun late in the evening on May 18, 2005, and continued into the early morning hours of May 19. But he further testified that the police were not aware of Jason Jones and did not consider him as a potential suspect until the afternoon of May 19. Consequently, the police did not even have a photograph of Jones during Washington's interview.

{¶ 47} Given that the police did not have a photograph of Jones in their possession at the time of Washington's interview, it necessarily follows that the individual photographs shown to Washington did not contain a photograph of Jones, and, accordingly, they did not influence Washington's identification of Jones in a later photographic lineup.

{¶ 48} The photographic lineup was not unnecessarily suggestive, nor was the identification unreliable, and the trial court did not err in denying Jones' motion to suppress. The sixth assignment of error is overruled.

(Doc. 6, Exh. 12 at 15-16).

A conviction based on identification testimony that follows a pretrial identification violates due process when "the pretrial identification procedure is so 'impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir. 1994), *cert. denied,* 515 U.S. 1145 (1995) (quoting *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir. 1986), *cert. denied,* 482 U.S. 918 (1987)) (in turn quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968)). It is the likelihood of misidentification which violates the defendant's due process right. *Neil v. Biggers,* 409 U.S. 188, 198 (1972). *See also Mills v. Cason,* 572 F.3d 246, 251 (6th Cir. 2009). The due process standard is premised on the concern that the trustworthiness of an eyewitness's identification can be easily undermined by improper police suggestion in circumstances where there already is a danger of misidentification because the witness is called upon to identify a stranger observed only briefly, under poor conditions, at a time of extreme emotional stress and excitement. *See Manson v. Brathwaite,* 432 U.S. 98, 112 (1977); *Simmons,* 390 U.S. at 383-84; *United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir. 1976). Therefore, the determination of whether the eyewitness's identification testimony is admissible at trial turns on the reliability of that testimony. *Manson,* 432 U.S. at 114; *see also Summitt v. Bordenkircher,* 608 F.2d 247, 251 (6th Cir. 1979), *aff'd sub nom. Watkins v. Sowders,* 449 U.S. 341 (1981).

The Court must engage in a two-step analysis in deciding whether the accused's right to due process has been violated through the use of a pretrial identification procedure. *Mills,* 572 F.3d at

27

251. The Court must first consider whether the procedure was unduly suggestive. *Id.* (citing *Ledbetter,* 35 F.3d at 1070-71). The defendant bears the burden of proving this element. *Ledbetter,* 35 F.3d at 1071 (citing *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.), *cert. denied,* 506 U.S. 964 (1992)). If the Court finds that the procedure was unduly suggestive, it must next evaluate the "totality of the circumstances" to determine whether the trial identification was nevertheless reliable. *Id.; see also Neil,* 409 U.S. at 199-200. The factors to be considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when identifying the defendant; and (5) the length of time between the crime and the identification. *Manson,* 432 U.S. at 114; *Neil,* 409 U.S. at 199-200; *United States v. Gatewood,* 230 F.3d 186, 193 (6th Cir. 2000), *cert. denied,* 534 U.S. 1107 (2002); *Ledbetter,* 35 F.3d at 1071.

Petitioner has not established that the initial photo array that was lost or missing necessarily contained his photo which rendered Washington's later identification of petitioner unreliable based on an unduly suggestive procedure. The record supports the Ohio Court of Appeals' determination that the individual photographs initially shown to Washington did not contain petitioner's photograph and therefore did not influence Washington's identification of petitioner in a later photographic lineup. Washington testified that on the date of the shooting when he initially spoke with Officer Ohl, the investigating officer, he was shown individual photographs. However, he was not shown a photo of petitioner on this date. (Doc. 6, Tr. 65-66, 69, 70). The first picture of petitioner he was shown was contained in an array of six photographs, one of which was petitioner, the day after his initial meeting with police. (Doc. 6, Tr. 70). Officer Ohl testified that on the date

of the shooting, petitioner's name had not surfaced and they "had no idea who he was." (Doc. 6, Tr. 75). Officer Ohl testified that on that date, no photograph of petitioner was available. (Doc. 6, Tr. 76). Officer Ohl testified that Washington was not shown a photograph of petitioner at the initial interview "because we had no idea who Jason Jones was." (Doc. 6, Tr. 829). It was not until the following day, after the initial interview with Washington had been concluded, that officers obtained a picture of petitioner. (Doc. 6, Tr. 75, 77). Petitioner's contention that his photo was shown to Washington during the initial interview is speculative and not supported by the record evidence.

The Court finds petitioner has failed to carry his initial burden of demonstrating that the photographic identification was impermissibly suggestive. *See* 28 U.S.C. § 2254(e)(1). Therefore, the Court need not assess whether the witness identification was reliable under the totality of the circumstances. Upon review of the record, this Court concludes that the Ohio Court of Appeals' rejection of petitioner's challenge to the pretrial identification was based on a reasonable assessment of the facts in light of the record evidence and was neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court in the *Neil* and *Manson* decisions.

Accordingly, petitioner is not entitled to habeas corpus relief with respect to his sixth ground for relief.

## IX. GROUND SEVEN OF THE PETITION IS WITHOUT MERIT.

Petitioner's seventh ground for relief asserts his sentence of eight years is "erroneous and excessive."

In addressing this claim of error, the Ohio Court of Appeals stated:

29

{¶ 49} In his seventh assignment of error, Jones argues that the trial court erred by imposing an excessive sentence. As we have stated, Jones received a sentence of eight years' imprisonment.

{¶ 50} Following the Ohio Supreme Court's decision in *State v. Foster*, a trial court has full discretion to impose a sentence that is within the available statutory range, and the court no longer needs to make findings or to provide reasons in support of such a sentence.[17] Jones was convicted of involuntary manslaughter, a felony of the first degree carrying a sentencing range of three to ten years' imprisonment.[18] The trial court's imposition of eight years' imprisonment fell within this range.

> Fn. 17. *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus.

> Fn. 18. See R.C. 2929.14.

{¶ 51} Accordingly, we conclude that the sentence imposed was not excessive. Jones' seventh assignment of error is overruled, and the judgment of the trial court is affirmed.

(Doc. 6, Exh. 12 at 16-17).

As the Ohio Court of Appeals reasonably determined, petitioner's eight-year sentence fell between the range of three to ten years under the applicable sentencing law. *See* Ohio Rev. Code § 2929.14(A)(1). Therefore, his sentence was not "erroneous" as a matter of state law. In any event, petitioner's claimed error of state law is not cognizable in this federal habeas corpus proceeding. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

To the extent petitioner may be claiming his sentence violates the Eighth Amendment, his sentence does not constitute cruel and unusual punishment because it fell within the statutory

maximum under the Ohio sentencing statute. *See Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000). The Constitution does not mandate proportionate sentences, *see Harmelin v. Michigan*, 501 U.S. 957, 965 (1991), and "only an extreme disparity between crime and sentence offends the Eighth Amendment." *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Federal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *U.S. v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995) (citing *Solem v. Helm,* 463 U.S. 277 (1983); *Rummel v. Estelle,* 445 U.S. 263 (1980); *United States v. Dumas,* 934 F.2d 1387 (6th Cir. 1990)). Petitioner's sentence fell within the statutory penalty for involuntary manslaughter, a felony of the first degree, and did not run afoul of the Eighth Amendment.

Petitioner has failed to demonstrate that the decision of the Ohio Court of Appeals is objectively unreasonable so as to constitute an unreasonable application of federal law. Ground Seven of the petition should therefore be denied.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 2) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has failed to make a substantial showing of the denial of a constitutional right based on his claims. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. The Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith" and, therefore,

31

**DENY** petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial

necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 5/21/10

Timothy S. Hogan
United States Magistrate Judge

JASON JONES,
    Petitioner,

Civil Action No. 1:09-cv-158

vs.

Barrett, J.
Hogan, M.J.

MICHAEL SHEETS,
    Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action brought under 28 U.S.C. § 2254. Any party may object to the Magistrate Judge's Report and Recommendation within **FOURTEEN (14) DAYS** of the filing date of this R&R. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within **FOURTEEN (14) DAYS** after the opposing party has been served with the objections. A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY | |
| --- | --- | --- |
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X | ☒ Agent<br>☐ Addressee |
| | B. Received by ( *Printed Name* ) | C. Date of Delivery |
| 1. Article Addressed to:<br><br>Jason Jones # 529-115<br>Ross Corr. Inst.<br>PO Box 7010<br>Chillicothe, OH 45601 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No | |
| | 3. Service Type<br>☒ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D. | |
| | 4. Restricted Delivery? *(Extra Fee)* ☐ Yes | |
| 2. Article Number<br>*(Transfer from service label)* | 7002 3150 0000 8389 8336 | |

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

1: 09cv158   (Doc. 20)